IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCHES OF** ) | |
| ) | **FILED UNDER SEAL** |
| **2420 TATE SPRINGS ROAD, J-10,** ) | |
| **LYNCHBURG, VA 24501** ) | |
| ) | Case No.    6:21mj13 |
| **2106 CARRINGTON ROAD,** ) | |
| **LYNCHBURG, VA 24501,** ) | |
| ) | |
| **4627 OXFORD STREET, B, LYNCHBURG,** ) | |
| **VA 24502, AND** ) | |
| ) | |
| **1516 MCKINNEY AVENUE,** ) | |
| **LYNCHBURG, VA 24502.** | |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Daniel Bailey, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises, outbuildings, and curtilage of

locations known as 2420 Tate Springs Road, J-10, Lynchburg VA 24501 ("TARGET ADDRESS

#1") located in the City of Lynchburg, Virginia; 2106 Carrington Road, Lynchburg, VA 24501

("TARGET ADDRESS #2") located in the City of Lynchburg, Virginia; 4627 Oxford Street, B,

Lynchburg, Virginia 24502 ("TARGET ADDRESS #3") located in the City of Lynchburg,

Virginia; and 1516 McKinney Avenue, Lynchburg, Virginia 24502 ("TARGET ADDRES #4"),

located in the City of Lynchburg, Virginia (collectively, the "TARGET ADDRESSES") within

the Western District of Virginia further described in Attachment A, for the things described in

Attachment B.

2.      I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and make arrest for, the offenses enumerated in Titles 18, 19, 21, 31 of the United States Code and other related offenses, since 2017.

3.      I am a Task Force Officer with the Drug Enforcement Administration (DEA) and have been since 2017.  I am also a Detective with the Lynchburg Police Department (Virginia) and be been so employed since 2002. I am currently assigned to investigate drug trafficking organizations as a member of the DEA, Washington Field Division/Roanoke Resident Office. My duties as a Task Force Officer involve the investigation of various criminal activities of narcotics traffickers and their associates.  In investigating these matters, I have acted as a case agent, an undercover agent, and a contact agent for confidential sources.  These investigations have resulted in the issuance of federal search warrants, seizure warrants, indictments, and convictions of persons for federal narcotics violations.  During my employment as a law enforcement officer, I have received multiple hours of training in narcotics enforcement and investigative techniques, and I have personally participated in numerous investigations.  I have also spoken on numerous occasions with informants, suspects, and other experienced narcotics traffickers concerning the methods and practices of drug traffickers, including the methods and practices used by traffickers of methamphetamine, heroin, and cocaine. I have been involved in the execution of numerous search warrants on electronic devices, including cellphones, and in obtaining location information for those devices.

4.      Based on training and experience in narcotics investigations, I know that:

a. Drug distributors often maintain books, receipts, notes, ledgers, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances in their residence, business, vehicles, and on their person.

b. Drug distributors very often place assets in the names of others than their own to avoid detection of these assets by law enforcement agencies.  Even though these assets are in other persons' names, the drug distributors continue to use these assets and exercise dominion and control over them.

c. Persons involved in large scale drug distribution and selling often conceal in or around their residences and/or businesses:  caches of drugs, large amounts of U.S. Currency, financial instruments, and evidence of financial transactions relating to obtaining, transferring, secreting or spending large amounts of money made from engaging in narcotics trafficking and selling activities.  As evidence below, during the course of this investigation, Jason HAMLETTE, Adrian MAYS, and others involved in this investigation were making a substantial profit from the sale of cocaine.

d. Distributors of Controlled Substance commonly "front" narcotics, that is provide narcotics to their clients on a consignment basis, and keep records of these transactions.  The aforementioned books, records, receipts, notes, ledgers, and other documents, are maintained where the distributors have ready access to them.

e. Large scale drug distributors secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residence and vehicles.

f.  Large scale narcotics distributors must maintain on hand large amounts of U.S. Currency in order to maintain and finance their ongoing narcotics business.

g.  Drug distributors sometimes take or cause to be made photographs or videotapes of themselves, their associates, their property, and their product.  These distributors usually maintain these photographs or other video materials in their possession.

h.  Drug distributors and sellers usually keep paraphernalia for the packaging, cutting, weighing, and distribution of controlled substances.  These items of paraphernalia include, but are not limited to, scales, plastic bags, wax, glass vases, masking agents and cutting agents.

i.  Drug distributors commonly use Personal Computers, laptop Computers, cellular telephones, handheld computers/tablets (Palm, PDA, etc.), computer files, indicating access to electronic mail services, hard drives, external drives, floppy disks, and any other electronic media to facilitate their drug distribution.  As evidenced below in the Affidavit, suspects including Jason HAMLETTE, Adrian MAYS, and various other subjects in this investigation, used telephones to communicate and arrange shipments or distribution of cocaine.

j.  Drug distributors and sellers commonly have in their possession, either on their person or in their residence and/or business, firearms, such as handguns, pistols, rifles, shotguns, and other types of firearms.  Said firearms are used to protect and secure drug distributor's and seller's property.

k.  Drug distributors often keep records of their illegal activities for a period of time extending beyond the time during which they actually possess illegal controlled

substances.  This allows drug distributors to keep records that would assist them in making contact with their criminal associates for possible future drug transactions; and so that they can have records of prior transactions for which, for example, a distributor might still be owed money, or might owe someone else money.   I am aware of cases in which traffickers have maintained evidence of prior trafficking activities for longer than two years after those activities.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on the facts set forth in this affidavit, there is probable cause to believe that Jason HAMLETTE ("HAMLETTE"), Adrian MAYS ("MAYS"), and others, are engaged in a conspiracy to violate federal drug laws, specifically: narcotics trafficking, in violation of 21 U.S.C. § 841(a); offenses involving the use of communications facilities in commission of narcotic offenses, in violation of 21 U.S.C. § 843(b); and maintaining a drug-involved premises, in violation of Title 21, United States Code, Section 856. There is probable cause to search the locations described in Attachment A for evidence, contraband, and/or fruits of these crimes further described in Attachment B.

## IDENTIFICATION OF THE PROPERTY TO BE SEARCHED

7.      TARGET ADDRESS #1 is a residence located at 2420 Tate Springs Road, J-10, Lynchburg, Virginia 24501. That residence is described as a three story, brick sided, multi-family apartment building. The letter "J" is posted on a blue awning on the front of the building.

The numbers "10" are posted on the front door of this apartment. TARGET ADDRESS #1 is believed to the residence of Jason HAMLETTE and where he resides most often.

8.      TARGET ADDRESS #2 is a residence located at 2106 Carrington Road, Lynchburg, Virginia 24501. This residence is described as a single story, brick sided, single family residence. The numbers "2106" are posted on two pillars on the front of the residence. TARGET ADDRESS #2 is believed to be a location where HAMLETTE keeps narcotics and evidence associated with the distribution of narcotics.

9.      TARGET ADDRESS #3 is a residence located at 4627 Oxford Street, B, Lynchburg, Virginia 24502. This residence is described as a brick, one story apartment. The numbers "4627" are on the side of the dwelling facing Oxford Street. TARGET ADDRESS #3 is believed to be a location where HAMLETTE keeps evidence associated with the distribution of narcotics.

10.     TARGET ADDRESS #4 is a residence located at 1516 McKinney Avenue, Lynchburg, Virginia 24502. This residence is described as a brick, single story, single family residence. The number "1516" are posted on a pillar on the front of the residence. TARGET ADDRESS #4 is believed to be the home of Adrian MAYS and the location from which MAYS sells narcotics.

**<u>PROBABLE CAUSE</u>**

**Identification of Jason HAMLETTE as a Narcotic Distributor**

11.     Jermel STOREY was a narcotics distributor based in Charlotte, North Carolina who supplied multiple individuals in Lynchburg, Virginia with significant quantities of cocaine and marijuana.

12.     In December 2020, law enforcement conducted surveillance of a residence located in the City of Lynchburg, Virginia. That residence was known by law enforcement to be a location frequented by Jermel STOREY. During that surveillance, law enforcement observed two vehicles, a black Lexus sedan and a grey Honda Pilot, arrive at that location. Law enforcement knew both of those vehicles to be associated with STOREY.

13.     The Honorable Robert S. Ballou issued a search warrant for the geo-location information of a phone believed to be used by STOREY, 6:20-MJ-31. Law enforcement was monitoring information obtained from this warrant. STOREY's cellular phone plotted in a geo-location that encompassed the residence where STOREY's vehicles arrived.

14.     After the two vehicles arrived, law enforcement observed multiple vehicles arrive at the residence and repeat the same pattern of activity: the vehicle would arrive, an occupant of the vehicle would enter the house, stay for a short period of time, leave the residence and re-enter their vehicle, and then leave. This affiant knew that type of activity to be consistent with narcotics sales occurring at the residence.

15.     During that same surveillance, law enforcement observed a gold Cadillac CTS, registered to HAMLETTE coming to that residence. That same vehicle was used by HAMLETTE to facilitate multiple cocaine sales later described in this affidavit.

16.     In January 2021, law enforcement executed a federal search warrant on the home of STOREY in Charlotte, North Carolina. During search of that residence, law enforcement located two pieces of paper with multiple names listed on it. Beside each of those names were numbers. Law enforcement recognized those pieces of paper to be an "owe sheet." Listed on the sheets was the name "Chi Chi' with "2k" and "$2000" beside the name. Law enforcement knows "Chi Chi" to be an alias for HAMLETTE. Based on the context of the document, this indicated

to law enforcement that HAMLETTE owed STOREY $2,000. Law enforcement also located the black Lexus sedan, described in paragraph 12 of this affidavit, in the garage of the residence.

17.     In January 2021, law enforcement also executed a federal search warrant a location in Charlotte, North Carolina that was suspected to be a stash house of narcotics for STOREY. A search of that residence yielded the grey Honda Pilot, described in paragraph 12 of this affidavit, parked in the garage. Inside that vehicle, law enforcement found a hidden compartment and located two kilograms of cocaine hydrochloride. Law enforcement also located an additional kilogram of cocaine hydrochloride inside the residence.

18.     Law enforcement analyzed phone tolls obtained from multiple, identified co-conspirators of this investigation, to include STOREY. During the analysis of that data, it was determined that the phone number used by HAMLETTE to facilitate drug sales was in contact with over five known narcotic distributors in the Western District of Virginia. HAMLETTE was also in contact with two cellular phone numbers previously identified as being used by STOREY to facilitate drug sales.

19.     Confidential Source #1 ("CS-1") identified HAMLETTE as a source of supply for cocaine hydrochloride and crack cocaine. CS-1 further advised that HAMLETTE sold Phencyclidine ("PCP"). CS-1 advised that they knew HAMLETTE to sell narcotics since mid-2019. CS-1 advised that CS-1 knew HAMLETTE to have a street alias of "CHI-CHI". CS-1 was providing intelligence to law enforcement in exchange for consideration on pending criminal charge.

20.     Between January 2021 through March 2021, law enforcement used CS-1 to conduct five controlled purchases of cocaine hydrochloride and/or crack cocaine from HAMLETTE. Those controlled purchases took place in Lynchburg, Virginia (Western District of

Virginia). CS-1 contacted HAMLETTE via phone call and/or text message to facilitate those transactions.

21.     HAMLETTE advised CS-1, during one of the controlled purchases, that Jermel "JAH" STOREY had recently been arrested. HAMLETTE advised CS-1 that the result of STOREY's arrest had interfered with the available supply of cocaine.

22.     In November of 2019, Confidential Source #2 ("CS-2") identified HAMLETTE as a distributor of narcotics. CS-2 advised that CS-2 knew HAMLETTE to be supplied with narcotics by Jermel STOREY. CS-2 advised that CS-2 knew HAMLETTE to have a street alias of "CHI-CHI". CS-2 was providing intelligence to law enforcement in exchange for consideration on pending criminal charge.

23.     HAMLETTE was previously convicted in the United States Court for the Western District of Virginia of Possession with the Intent to Distribute More than Five Grams of Cocaine Base, for which he received a sentence of 60 months in July 2007.

24.     HAMLETTE was also previously convicted in the United States Court for the Western District of Virginia of three counts of Distribution of Cocaine Base, for which he received a sentence of 54 months in October 2011.

### Identification of Adrian MAYS as a Narcotic Distributor

25.     Law enforcement analyzed phone tolls obtained from multiple, identified co-conspirators of this investigation, to include STOREY. During the analysis of that data, it was determined that the number used by MAYS to facilitate drug sales was in contact with a known narcotic distributor in the Western District of Virginia. MAYS was also in contact with two cellular phone numbers previously identified as being used by STOREY to facilitate drug sales.

26.     As described in paragraphs 12 through 14, law enforcement conducted surveillance at a residence in Lynchburg in December 2020.

27.     During that same surveillance, law enforcement observed a Volvo XC90 coming to that residence on two occasions. That vehicle was found to be registered to Michelle ROSE with a listed address of TARGET ADDRESS #4. That same vehicle was used to by MAYS to facilitate a cocaine sale described in this affidavit.

28.     In February 2021, Confidential Source #3 ("CS-3") identified Adrian MAYS as a source of supply for crack cocaine. CS-3 advised that MAYS was living and distributing narcotics out of TARGET ADDRESS #4. CS-3 advised that CS-3 knew MAYS to go by the alias of "DRED". CS-3 was providing intelligence to law enforcement in exchange for possible consideration on pending criminal charges.

29.     In January 2021, law enforcement executed a federal search warrant on the home of STOREY in Charlotte, North Carolina. During search of that residence, law enforcement located two pieces of paper with multiple names listed on it. Beside each of those names were numbers. Law enforcement recognized those pieces of paper to be an "owe sheet". Listed on the sheets was the name "DREAD" with "13,500" and "$13,500" beside the name. Based on the context of the document, this indicated to law enforcement that MAYS owed STOREY $13,500.

30.     Between February 2021 through March 2021, law enforcement used CS-3 to conduct two controlled purchases of crack cocaine from MAYS. Those controlled purchases took place in Lynchburg, Virginia (Western District of Virginia). CS-3 contacted MAYS via phone call and/or text message to facilitate those transactions.

**Identification of and Criminal Activity Associated with TARGET ADDRESSES**

**TARGET ADDRESS #1**

31.     In November 2019, HAMLETTE reported to the Lynchburg Police Department that Latoria WATSON was HAMLETTE's girlfriend. HAMLETTE further reported that WATSON lived at TARGET ADDRESS #1.

32.     In August 2020, a victim of an assault reported to the Lynchburg Police Department that they were assaulted by HAMLETTE. The victim further reported that HAMLETTE fled the scene of the assault in a gold Cadillac CTS. The victim provided the license of that vehicle and it was the same license plate as all other occurrences described in this affidavit.

33.     In September 2020, WATSON called the Lynchburg Police Department to TARGET ADDRESS #1 in reference to HAMLETTE causing property damage to her vehicle. WATSON described HAMLETTE as an ex-boyfriend.

34.     CS-1 advised law enforcement that they believed HAMLETTE to live in the Park Place Apartments. That complex establishment encompasses TARGET ADDRESS #1. CS-1 advised law enforcement that CS-1 had previously conducted a cocaine purchase from HAMLETTE in the parking lot in front of TARGET ADDRESS #1. TARGET ADDRESS #1 is believed to be the location where HAMLETTE resides.

35.     On January 19, 2021, law enforcement used CS-1 to conduct a controlled purchase of cocaine from HAMLETTE. CS-1 was fitted with a recording device and monitored by law enforcement during the transaction. CS-1 was also provided funds to conduct the purchase. That controlled purchase took place in Lynchburg, Virginia. During that controlled purchase, HAMLETTE used his gold Cadillac CTS (previously described in this affidavit) to facilitate the drug sale.

36.     On February 5, 2021, law enforcement used CS-1 to conduct a controlled cocaine purchase from HAMLETTE. CS-1 was fitted with a recording device and monitored by law enforcement during the transaction. CS-1 was also provided funds to conduct the purchase. That controlled purchase took place in Lynchburg, Virginia. During that controlled purchase, HAMLETTE used his gold Cadillac CTS (previously described in this affidavit) to facilitate the drug sale.

37.     On February 12, 2021, law enforcement obtained a search warrant, issued by a Magistrate of the Commonwealth of Virginia, authorizing the installation of a GPS tracking device on HAMLETTE's gold Cadillac CTS (previously described in this affidavit). On March 12, 2021 law enforcement obtained an extension to the search warrant. That extension was issued by a Lynchburg Circuit Court Judge. During the analysis of that data, it was determined that HAMLETTE's vehicle frequented the building containing TARGET ADDRESS #1 on approximately a daily basis, regularly on an overnight basis.

38.     On February 19, 2021, law enforcement observed HAMLETTE enter TARGET ADDRESS #1.

39.     On February 26, 2021, law enforcement used CS-1 to conduct a controlled purchase of cocaine from HAMLETTE. CS-1 was fitted with a recording device that was monitored by law enforcement during the transaction. CS-1 was also provided funds to conduct the purchase.  CS-1 was instructed by law enforcement to contact HAMLETTE, via cell phone, to order an amount of cocaine for purchase. After that phone call was made, HAMLETTE's gold Cadillac was observed parking in front of the building containing TARGET ADDRESS #1. Law enforcement then observed the driver of the gold Cadillac walk into TARGET ADDRESS #1. A short period later, a male was observed walking out of the building containing TARGET

ADDRESS #1 and get into the passenger seat of another vehicle. That vehicle travelled to the location of the controlled purchase. CS-1 identified the passenger of that vehicle as HAMLETTE. CS-1 completed the purchase and obtained a quantity of cocaine from HAMLETTE.

40.     On March 6, 2021, law enforcement was called to TARGET ADDRESS #1 to investigate a complaint of a domestic assault and battery. HAMLETTE was determined to be the assailant and fled the scene prior to the arrival of law enforcement.

41.     On March 10, 2021, law enforcement conducted a physical and electronic surveillance (GPS installation) on HAMLETTE. During that surveillance, law enforcement observed HAMLETTE leaving apartment building containing TARGET ADDRESS #1 and leaving in his gold Cadillac CTS. HAMLETTE was then followed and observed parking in front of TARGET ADDRESS #3. HAMLETTE was observed walking towards TARGET ADDRESS #3 but was not observed walking into the residence. HAMLETTE was then followed to Greensboro, NC. HAMLETTE stayed in the Greensboro, North Carolina for approximately two hours. HAMLETTE was followed back to TARGET ADDRESS #1. HAMLETTE was observed leaving TARGET ADDRESS #1 and followed to TARGET ADDRESS #2. Law enforcement has previously acquired information from known users and sellers of narcotics who have identified the greater Greensboro, North Carolina area to be a source city of narcotics for Lynchburg, Virginia. Based on my training and experience and the circumstances of the trip, I believe HAMLETTE made this trip to Greensboro, North Carolina for the purpose of obtaining narcotics. I also believe HAMLETTE visited the TARGET ADDRESSES prior to the trip to collect payment for the purchase of narcotics and after the trip to store those narcotics.

42.     On March 18, 2021, law enforcement used CS-1 to conduct a controlled crack cocaine buy from HAMLETTE. That controlled purchased took place in Lynchburg, Virginia. CS-1 was fitted with a recording device and monitored by law enforcement during the transaction. CS-1 was also provided funds to conduct the purchase. CS-1 completed the purchase of a quantity of crack cocaine.

## TARGET ADDRESS #2

43.     TARGET ADDRESS #2 is believed to be a residence in which Catria SMITH resides and where HAMLETTE is suspected of storing narcotics and items used in the distribution of narcotics.

44.     On January 14, 2021, law enforcement used CS-1 to conduct a controlled purchase of cocaine from HAMLETTE. CS-1 was fitted with a recording device and monitored by law enforcement during the transaction. CS-1 was also provided funds to conduct the purchase. During that controlled purchase, HAMLETTE arrived with the cocaine riding in Dodge Dart. That vehicle was found to be registered to Catria SMITH. A search of law enforcement data bases revealed that SMITH has a home address of TARGET ADDRESS #2.

45.     Based on the acquired data between February 12, 2021 and March 22, 2021, obtained from the previously mentioned GPS device installed on HAMLETTE's Cadillac CTS, HAMLETTE's vehicle had frequented an area encompassing TARGET ADDRESS #2 approximately 23 days of the 39 days of data available at this authoring of this affidavit.

46.     In the last 30 days, HAMLETTE has been observed by law enforcement going in/leaving TARGET ADDRESS #2 on multiple occasions. On February 19, 2021, law enforcement observed HAMLETTE walk into TARGET ADDRESS #2 without knocking or utilizing a key to enter the door.

47.     On March 10, 2021, law enforcement conducted a physical and electronic surveillance on HAMLETTE. During that surveillance, HAMLETTE was followed from Lynchburg, Virginia to Greensboro, North Carolina, and then back to Lynchburg, Virginia. Upon HAMLETTE's return to Lynchburg, Virginia. HAMLETTE was followed to TARGET ADDRESS #2. Almost simultaneously when HAMLETTE arrived, a black female also arrived driving the previously mentioned Dodge Dart. Both HAMLETTE and the female were observed walking into TARGET ADDRESS #2 together.

### TARGET ADDRESS #3

48.     TARGET ADDRESS #3 is believed to be the residence of Sherai JEFFERSON and an additional location in which HAMLETTE is suspected of storing narcotics and items used in the distribution of narcotics.

49.     In March 2020, law enforcement subpoenaed US Cellular for the subscriber and toll data records of the cellular phone number used by HAMLETTE to facilitate HAMLETTE's drug sales. Based on the data received, the subscriber of that cellular phone number was Sherai JEFFERSON.

50.     JEFFERSON was identified as the driver of the Dodge Dart during that controlled purchase that occurred on January 14, 2021 that was previously described in this affidavit.

51.     A search of a law enforcement database, revealed that JEFFERSON claims a home address of TARGET ADDRESS #3.

52.     On March 10, 2021, law enforcement observed a vehicle parked in front of TARGET ADDRESS #3 that was registered to JEFFERSON. Also on that date, law enforcement observed HAMLETTE park in front of TARGET ADDRESS #3. Law enforcement observed

HAMLETTE walk towards the entrance of TARGET ADDRESS #3 but could not see if HAMLETTE walked into the target address from their surveillance position.

53.     Between February 12, 2021 and March 10, 2021, HAMLETTE's gold Cadillac CTS was tracked, via the previously mentioned GPS warrants, on at least three occasions to Greensboro, North Carolina. On all occasions, HAMLETTE stopped in an area encompassing TARGET ADDRESS #3 just prior to going to/or coming back from Greensboro, North Carolina.

54.     Law enforcement conducted a utility check of TARGET ADDRESS #3 and determined that JEFFERSON was the account holder.

55.     Based on the acquired data February 12, 2021 through March 22, 2021, obtained from the previously mentioned GPS device installed on HAMLETTE's Cadillac CTS, HAMLETTE's vehicle had frequented an area encompassing TARGET ADDRESS #2 approximately 23 days of the 39 days of data available at this authoring of this affidavit.

## TARGET ADDRESS #4

56.     TARGET ADDRESS #4 is believed to be the home address of Adrian MAYS. CS-3 advised that CS-3 had known MAYS to live at the TARGET ADDRESS #4 for approximately one year.

57.     In February of 2021, law enforcement used CS-3 to conduct a controlled purchase of crack cocaine from MAYS. CS-3 was fitted with a recording device and monitored by law enforcement during the transaction. CS-3 was also provided funds to conduct the purchase. During that controlled purchase, law enforcement observed MAYS leave TARGET ADDRESS #4 just prior to selling the cocaine to CS-3 and then immediately returning back to TARGET ADDRESS #4 after the purchase.

58.     In March of 2021, law enforcement used CS-3 to conduct a controlled purchase of crack cocaine from MAYS. CS-3 was fitted with a recording device and monitored by law enforcement during the transaction. CS-3 was also provided funds to conduct the purchase. During that controlled purchase, CS-3 bought the crack cocaine from MAYS inside of TARGET ADDRESS #4.

## SUMMARY

59.     Based on the aforementioned, your affiant respectfully submits that there is probable cause to believe that Jason HAMLETTE, Adrian MAYS, and others, have violated Title 21, United States Code, Section 841, to wit: distribution of cocaine and cocaine base, which are controlled substances, and that drugs, documentation, and other items related to the illegal distribution of cocaine and marijuana will be located in the residences at the TARGET ADDRESSES.

60.     Based on the aforementioned, your affiant respectfully submits that there is probable cause to believe that U.S. Currency, documentation, and/or other items related to the illegal distribution of narcotics and money laundering further described in Attachment B will be located at the TARGET ADDRESSES.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

61.     As described above and in Attachment B, this application seeks permission to search for records that might be found at the TARGET ADDRESSES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

62.     *Probable cause.*  I submit that if a computer or storage medium is found at the
TARGET ADDRESSES, there is probable cause to believe relevant records will be stored on
that computer or storage medium, for at least the following reasons:

    a.   Based on my knowledge, training, and experience, I know that computer
files or remnants of such files can be recovered months or even years after
they have been downloaded onto a storage medium, deleted, or viewed via
the Internet.  Electronic files downloaded to a storage medium can be
stored for years at little or no cost.  Even when files have been deleted,
they can be recovered months or years later using forensic tools.  This is
so because when a person "deletes" a file on a computer, the data
contained in the file does not actually disappear; rather, that data remains
on the storage medium until it is overwritten by new data.

    b.   Therefore, deleted files, or remnants of deleted files, may reside in free
space or slack space—that is, in space on the storage medium that is not
currently being used by an active file—for long periods of time before
they are overwritten.  In addition, a computer's operating system may also
keep a record of deleted data in a "swap" or "recovery" file.

    c.   Wholly apart from user-generated files, computer storage media—in
particular, computers' internal hard drives—contain electronic evidence of
how a computer has been used, what it has been used for, and who has
used it.  To give a few examples, this forensic evidence can take the form
of operating system configurations, artifacts from operating system or
application operation; file system data structures, and virtual memory

18

"swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

63.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the Crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the TARGET ADDRESSES because:

d.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

e.   As explained herein, information stored within a computer and other

electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the Criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the Crime under investigation.  Additionally, some information

stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a Crime (e.g., internet searches indicating Criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

f.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

g.  The process of identifying the exact files, blocks, registry entries, logs, or

21

other forms of forensic evidence on storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

h. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

i. I know that when an individual uses a computer to communicate online with a victim in a fraud scheme, the individual's computer will generally serve both as an instrumentality for committing the Crime, and also as a storage medium for evidence of the Crime. The computer is an instrumentality of the Crime because it is used as a means of committing the Criminal offense. The computer is also likely to be a storage medium for evidence of Crime. From my training and experience, I believe that a computer used to commit a Crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received;

notes as to how the Criminal conduct was achieved; records of Internet discussions about the Crime; and other records that indicate the nature of the offense.

64.     *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premise for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  <u>Technical requirements</u>.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  <u>Variety of forms of electronic media</u>.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

65.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

2.    In my training and experience, it is likely that the TARGET ADDRESSES will contain at least one Apple brand device, such as an iPhone or iPad, because STOREY was previously determined to have iCloud account, which is a service associated with having an Apple device.

66.    I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as

iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

67.     If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

68.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

69.     The passcode or password that would unlock the Apple device(s) found during the search of the TARGET ADDRESSES is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of the Apple device(s) found during the search of the TARGET ADDRESSES to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant Apple device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not

otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

70.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the TARGET ADDRESSES to press their finger(s) against the Touch ID sensor of the locked Apple device(s) found during the search of the TARGET ADDRESSES in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

71.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers.  In the event that law enforcement is unable to unlock the Apple device(s) found in the TARGET ADDRESSES as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

72.     Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the TARGET ADDRESSES to the Touch ID sensor of the Apple brand device(s), such as an iPhone or iPad, found at the TARGET ADDRESSES for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.[1]

---

[1] Law enforcement shall select the finger.

## CONCLUSION

73.      Based on my training, experience, and the foregoing facts set forth herein, I believe that probable cause exists to search the addresses described in Attachment A, along with the curtilage surrounding TARGET ADDRESS #4, as described in Attachment A and to seize items described in Attachment B.

74.      I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the devices described in Attachment A, in order to seek the items described in Attachment B.

## OATH

I declare under penalty of perjury that the foregoing is true and correct.


Respectfully submitted,

> *s/Daniel Bailey*
> Daniel Bailey, Task Force Officer
> Drug Enforcement Administration

Received by reliable electronic means and sworn and attested to by telephone on this 25th  day of March 2021.


*Robert S. Ballou*
ROBERT S. BALLOU
UNITED STATES MAGISTRATE JUDGE